**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CLIFFORD MICHEL, *et al.,* | § | |
| | § | CIVIL ACTION 1:21-CV-681 |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| WORKRISE TECHNOLOGIES, INC. *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

### <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants Workrise Technologies Inc. and HCS Renewable Energy LLC (collectively, "Defendants") file this Motion for Summary Judgment on all of Plaintiffs' claims (discrimination for the termination of their employment under Title VII and 42 U.S.C. § 1981).

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: /s/ Alana K. Ackels

    Alana K. Ackels
    aackelsatbellnunnally.com
    State Bar No. 24066760
    Jay M. Wallace
    jwallaceatbellnunnally.com
    State Bar No. 20769200
    Nathan Cox
    State Bar No. 24105751
    ncoxatbellnunnally.com
    Joshua D. Fuller
    State Bar No. 24091393
    jfulleratbellnunnally.com

    2323 Ross Avenue, Suite 1900
    Dallas, Texas 75201
    214-740-1400 Telephone
    214-740-1499 Facsimile

**COUNSEL FOR DEFENDANTS
WORKRISE TECHNOLOGIES INC.
AND HCS RENEWABLE ENERGY
LLC**

## CERTIFICATE OF SERVICE

I certify that on April 3, 2024, I served a true and correct copy of the foregoing, by and through CM/ECF, on all known counsel of record in accordance with the Federal Rules of Civil Procedure.

By: /s/ Alana K. Ackels
    Alana K. Ackels

## I.    INTRODUCTION

In 2020, a major company, like many other businesses, was faced with an unprecedented situation: trying to operate safely and productively during a global pandemic. The company employed crews of approximately fifty individuals who traveled together, worked closely together, socialized together, and commonly lived together, at least while working. The company, as well as public health authorities, instituted COVID protocols for the safety of all crews working on-site as well as the general public. Unfortunately, multiple individuals from one crew were found to have repeatedly breached the protocols, and that crew was the predominant source of positive COVID results. As a result, the company had to shutdown the work site, postpone employment of the crew, and the crew as a whole was punished. What company? The Tennessee Titans football team. In October 2020, without finding that each member of the Titans team (i.e., their crew) violated COVID protocols or tested positive, the National Football League ("NFL") fined the entire team $350,000 for not wearing masks and for unauthorized social gatherings. The NFL later implemented a COVID protocol that if a team had too many COVID positives leading to a canceled game, then the players on both teams would lose their game checks, regardless of who tested positive or negative; regardless of who was found to have violated protocols or not.

Months before what happened to the Titans, and with less information and resources, in Spring 2020, the defendant in this case, HCS Renewable Energy, LLC ("HCS"), faced a similar dilemma. HCS was a staffing company that sourced workers for a solar project in San Angelo, Texas (the "Rambler project"). The Rambler project already worked on a tight deadline that could not afford disruption. However, in addition to encountering production issues (including installing solar panels incorrectly), the early days of the pandemic caused significant delay for the construction project and a two-week shutdown of the entire construction site due to a spike in COVID Cases. Tom Green County public health officials along with Signal Energy (the general

contractor for this project), Arraycon (the subcontractor), and HCS (the staffing company providing the workers to its client, Arraycon), implemented COVID protocols to ensure the safety of the workers on the Rambler project. By and large, the crews working at the Rambler project (whether HCS, Arraycon, Signal, or others) complied with the COVID protocols. However, there was one crew that was creating issues. There was one crew that had most of the COVID-19 positive tests. There was one crew that was observed by multiple third parties, including public health authorities, breaching COVID-19 protocols. That was HCS's Haitian solar module installer crew, and that is why Arraycon requested the crew be removed from the project. Based on the legitimate, non-discriminatory reasons provided by its client—which had been corroborated by others, including Signal Energy and the county health department—HCS honored its client's request.

Even standing alone, these a legitimate, non-discriminatory reasons for the crew's removal are fatal to Plaintiffs' claims. However, the context surrounding the layoffs further proves there was no animus (racial, national origin, or otherwise) for the decision. The layoff was a temporary removal and not discriminatory because 1) HCS offered to rehire the Haitian crew on other projects (and in fact sent an email offering projects to Plaintiff Michel the same day as the layoff); and 2) HCS ultimately did rehire more than half of the Haitian crew. Additionally, there were other Black and/or Haitian HCS employees at Rambler who were not part of the installer crew raising COVID concerns, and they were not terminated—they continued to work for HCS at the Rambler site after the Plaintiffs were removed. For this and other reasons outlined below, Plaintiffs' claims should be dismissed in whole or in part.

## II.   FACTUAL BACKGROUND

1)      HCS is a staffing company formed in 2015 to provide staffing services for clients in the solar energy industry. Nickelson Dec. ¶ 1–2. HCS provided temporary labor for large solar

installation projects across the country. Burns Decl. ¶ 2. HCS is an equal employment opportunity employer. Nickelson Decl. ¶ 2.

2)    HCS was acquired in December 2019 by Workrise (at the time RigUp, Inc. until it was rebranded to Workrise in early 2021). Ron Nickelson, the founder of HCS, stayed with the company after the acquisition to continue running HCS as wholly owned subsidiary. Nickelson was not a member of Workrise's executive management team. Edler Decl. ¶ 2.

3)    The executive management team of Workrise did not have involvement in the daily employment decisions of field HCS employees in the first half of 2020, including the termination of Plaintiffs in this lawsuit. Workrise did not: 1) issue paychecks to Plaintiffs under its EIN; 2) make decisions on field layoffs, transfers, or promotions of HCS employees or contractors at the time; 3) issue W2s or 1099s to Plaintiffs; 4) control or supervise HCS field personnel or Plaintiffs; or (5) control the day-to-day field operations of HCS. Elder Decl. ¶ 4.

4)    Workrise merely provided back-office support to HCS at the time Plaintiffs were laid off. At the time the Plaintiffs were laid off, Workrise did not do the following: 1) commingle or share bank accounts, accounts receivable, or inventory with HCS; 2) maintain HCS's financial books; or 3) issue paychecks to field employees under its EIN. Elder Decl. ¶ 5.

5)    The Plaintiffs were employees of HCS. Frédéric Dep. at 9:15-10:10; Louis Dep. at 72:23-74:2; *see* Michel Dep. at 52:16-54:4, 62:9-17. They were paid under the HCS EIN, and were managed in the field by HCS employees or employees of the worksite client, in this case either Arraycon or Signal. *See* Elder Decl. ¶¶ 4, 5; Burns Decl. ¶ 2.

6)    Decisions made regarding labor relations in the field with employees like Plaintiffs were made by HCS, not Workrise. Burns Decl. ¶ 2. The decision to lay off the HCS crew that included the Plaintiffs did not involve Workrise leadership. Burns Decl. ¶ 2; Elder Decl. ¶ 4.

**A. HCS Was Known For Employing Large Solar Installer Crews Comprised of Haitian Installers, Before and After the Plaintiffs Worked for HCS.**

7)      HCS was known in the industry for employing large crews comprised primarily of Haitian employees. Nickelson Dep. 22:2-20. This was largely due to HCS's work with Haitian ambassadors, who were Haitian HCS employees that would recruit manpower for projects, often from their own communities, and serve as ambassadors and translators for the Haitian crews while working on a jobsite for HCS. Nickelson Dec. at ¶ X.  This was the case before and after Plaintiffs worked for HCS. Nickelson Dep. 22:2-20.

8)      HCS had a strong network of ambassadors that assisted in the recruitment of manpower for projects. Nickelson Decl. ¶ 4; Nickelson Dep. at 22:2-13. The ability of HCS to staff up and staff down projects quickly was critical to its success.

9)      HCS kept track of its ambassadors in the fields and the crews associated with those ambassadors, so it could provide the appropriate translators for the crew (primarily French Creole or Spanish).  Nickelson Dep. 56:1-25.

10)      HCS is a temporary staffing company. Plaintiff Louis has worked in the solar temporary staffing industry for many years, and she described taking short, temporary jobs all over the country, both before and after working for HCS. Louis Dep.. 54:25-69:23. She got many of these jobs through Haitian recruiters, or ambassadors. *Id*. Louis said it was common on these temporary jobs for members of the same crew to stay together on jobs. Louis Dep. 51:13-52:1. When Plaintiff Michel was working for HCS, he stayed with other Haitian members of his crew. Michel Dep. 55:1-57:15. Michel described the strong cultural bond of the Haitian community. Michel Dep. 38:18-40:15.

**B.  The Rambler Project Started in 2019 with a Goal of Completion in April 2020.**

11)    In 2019, HCS contracted with Arraycon Construction, LLC ("Arraycon") to provide staffing services at a solar project in San Angelo, Texas called the Rambler solar project. HCS provided solar panel installer crews to Arraycon at the Rambler site. Arraycon was a subcontractor of Signal Energy, which was the engineering and procurement construction company or "EPC," at Rambler. Nickelson Decl. ¶ 3.

12)    At the Rambler site, HCS staffed a crew of solar module installers to Arraycon that was recruited by Haitian ambassadors, largely through Jean Jamesly Brisseau ("Brisseau"). Nickelson Decl. ¶¶ 4-5. Plaintiff Michel and Louis both testified they were recruited through Brisseau, and he was the Haitian ambassador at the Rambler project. See Michel Dep.. 42:4-20, 47:12-25; Louis Dep. 70:12-73:20. Most of the workers Brisseau recruited for projects were Haitian. Michel Dep. 45:16-46:10.

13)    In early 2020, before the COVID-19 pandemic hit, the goal was to have all solar modules installed onsite at Rambler by April 20, 2020. Nickelson Decl. ¶ 6. To meet that goal, HCS was tasked by Arraycon with fixing workmanship issues onsite. *Id*. Many solar panels had been installed incorrectly, which resulted in the need for additional quality control and delays, which resulted in production delays. *Id*. Arraycon was frustrated with these production and workmanship issues at the Rambler project going into COVID. *Id*.

14)    On February 26, 2020, Arraycon's project manager wrote to HCS saying, among other things: "I wanted to make sure that everyone fully understand what needs to occur in a little over a month and half. We must have all the modules installed onsite by April 20, 2020…How does HCS plan to fix the workmanship issues that we are seeing onsite?...we need the entire HCS team to understand the magnitude of the situation we are now in due to the lack of production and workmanship issue onsite." *See* Nickelson Decl. ¶ 6, Ex. 1 (HCS_15716).

### C.  The COVID-19 Pandemic

15)     On March 11, 2020, a global pandemic was declared.[1]

16)     On March 12, 2020, the first U.S. lockdown orders began in New York.[2] By April 3, 2020, parts of the world were so overwhelmed that bodies were being left in the streets.[3] On April 14, 2020, it was reported that hospitals in the United States were so overcome with COVID patients and deaths that "bodies [were] being stored in vacant hospital rooms and piled on top of each other inside refrigerated holding unites brought into the hospital's parking lot."[4]

17)     In early March, Texas began to issue lockdown orders. On March 11, 2020, Harris County declared a local disaster for public health emergency.[5] On March 13, 2020, the Texas Governor declared a state of disaster.[6] On April 12, 2020, the Texas Governor renewed the disaster proclamation for all counties in Texas.[7]

### D.  The Rambler Project Implemented COVID Protocols to Stay Open.

18)     When the COVID-19 pandemic hit in March, 2020, it presented challenges for the operations of the Rambler project. To continue operations safely, several protocols were issued by a combination of public health authorities, Arraycon, and Signal, including requirements for social distancing, wearing masks, and handwashing. Nickelson Decl. ¶7. The HCS Safety Director, Kendall Roberson, outlined the protocols being rolled out at the Rambler site in daily safety

---

[1] https://www.cdc.gov/museum/timeline/covid19.html
[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7405141/#:~:text=In%20the%20United%20States%2C%20the,exposed%20to%20stay%20at%20home
[3] https://www.washingtonpost.com/world/the_americas/coronavirus-guayaquil-ecuador-bodies-corpses-streets/2020/04/03/79c786c8-7522-11ea-ad9b-254ec99993bc_story.html
[4] https://www.cnn.com/2020/04/13/health/detroit-hospital-bodies-coronavirus-trnd/index.html
[5] https://www.westutx.gov/DocumentCenter/View/6863/GA-36?bidId=
[6] https://gov.texas.gov/news/post/governor-abbott-extends-disaster-declaration-for-covid-192
[7] https://gov.texas.gov/news/post/governor-abbott-extends-disaster-declaration-for-covid-192

meetings and refresher courses being held onsite. Nickelson Decl. ¶ 7, Ex. 3, 4 (HCS_15999-16035; HCS_16200-01).

19)     Employees who were found violating the COVID protocols onsite were asked to be removed by Arraycon. *See, e.g.*, Burns Decl. ¶¶ 12-13, Ex. 5 (HCS_15908, laying off a group of Hispanic workers in March, 2020, who were found to have been violating COVID protocols).

20)     In April, 2020, Arraycon and Signal became unhappy due to instances of an HCS Haitian installer crew breaching COVID protocols onsite at Rambler. For example, on April 14 and 15, 2020, Arraycon and Signal observed only one crew breaching COVID protocols, which was a Haitian installer crew led by Joseph Simon, also known as "Watson," who is Haitian. Burns. Decl. ¶ 7, Ex. 1 (HCS_16325); Michel Dep. at 67:14-23. Arraycon demanded that HCS address COVID protocol compliance with its crews onsite. Burns. Decl. ¶ 7, Ex. 1 (HCS_16325). HCS laid off Watson due to the violation. *Id*. Plaintiff Michel worked on Watson's crew. Michel Dep. at 67:14-23.

21)     In early April, HCS worked to procure COVID-19 testing through a company called "imaware" to keep workers safe and keep the Rambler jobsite up and running. Nickelson Decl. ¶ 8, Ex. 5 (HCS_15945).

22)     On or around April 26, 2020, HCS learned that 8 out of 9 HCS employees initially tested at the Rambler project had tested positive for COVID. Nickelson Decl. ¶ 9, Ex 6. (HCS_16906.) This included Plaintiff Ralph Frederic. *Id*. All 8 positive cases stayed at the Inn of the Conchos while working for HCS at the Rambler site. Id. at Ex. 7 (HCS_17332). By this time, Plaintiff Frederic had left the project and returned home. *Id*.; Frédéric Dep. at 20:23-22:7. This information was reported to the Rambler site and the Tom Green County Health Department. Nickelson Decl. ¶ 9, Ex. 7 (HCS_17332).

**E.  On April 27, 2020, the Rambler Site Shut Down for Over Two Weeks to Allow for Testing and Quarantine.**

23)     Due to the outbreak onsite, Rambler shut down for testing on April 27, 2020. Nickelson Decl. ¶ 10, Ex. 8 (HCS_16962). The Rambler project was shut down just over two weeks to conduct COVID testing and allow for quarantining. *Id*. Following the testing, the county health department conducted contact tracing to evaluate when and whether the site could safely re-open. *Id*.

24)     On April 30, Tom Green County, at the direction of Dr. James Vretis (Public Health Authority for Tom Green County), implemented a control measure that ordered the isolation and quarantine of people who were tested for COVID or presented symptoms of COVID. Nickelson Decl. at 11, Ex. 10 (City_of_San_Angelo_HCS_000001). HCS was required to report COVID test results to the county. *Id*., Ex. 11 (HCS_04634).

25)     Under the County's control measure, anyone who had been tested was instructed to quarantine and wear a mask anytime they must leave their dwelling for the limited purposes permitted by the order, such as to obtain food. *Id*.

26)     Dr. Vretis, the public health authority, personally visited multiple locations where the HCS/ Arraycon Haitian crews were staying, and he did not see anyone observing the COVID control measures. Vretis Dep. at 24:4-23, 26:8-27:4, 28:2-29:4, 29:5-30:19. Vretis shared his observations with the stakeholders at the Rambler site. *Id*. at 32:4-20.

27)     Similarly, Holly Walraven, the long-time front desk clerk at the Inn of the Conchos, said that the Haitian HCS workers that stayed there during the COVID shutdown did not following the COVID control measures from the county. *See* Walraven Dep.. 18:10-20:13.

28)     Following the site-wide testing, it was discovered that all of the positive COVID cases came from HCS installer crews and the vast majority of the positive cases were concentrated

within the Haitian installer crew. *See* Vretis Dep. at Ex. 12, 13 (showing positive cases); *see also* Nickelson Decl. ¶ 9. This was the same crew with members who were found by both Arraycon and Tom Green County to have broken COVID protocols. *See* Burns Decl. ¶7; Vretis Dep. At 24:4-23; 26:8-27:4; 28:2-29:4; 29:5-30:19.

### F. Arraycon Requested the Removal of Plaintiffs' Crew from Rambler, and HCS Worked to Re-Assign the Crew to Other Projects.

29)     Arraycon was aware that the majority of COVID positive cases were concentrated within the HCS Haitian crew, and Arraycon was aware of repeated breaches of COVID safety protocols by the HCS Haitian crew reported both onsite by Signal and during the quarantine shutdown from the Tom Green County Health Department. *See* Vretis Dep. at 24:4-23; 26:8-27:4; 28:2-29:4; 29:5-30:19; *see* Vretis Dep. at Ex. 12, 13 (showing positive cases); *see also* Nickelson Decl. ¶ 9; *see also* Burns Decl. ¶ 12.  Arraycon notified HCS of its COVID concerns related to the HCS Haitian crews, and Arraycon requested that the HCS Haitian crews be removed from the Rambler project. Burns Decl. ¶ 11; Nickelson Dep. at 46:12 – 48:1, 61:1-62:7, 65:8-66:23, 108:3-19, 112:16-113:17, 113-114:19. Nickelson testified:

> Arraycon made that decision on a number of factors. Individuals that had tested positive, individuals that had been around people that tested positive, the fact that everyone was afraid everyone within that group, that install group associated with the Haitians, would ultimately test positive, that their determination was that would affect production on a move-forward basis, they were under extremely tight timelines to finish the project, and so they made a business decision it would be better to move away from this crew…..
>
> The decision was made, from an HCS perspective, to pull those off of this project in direction from the directive of the client, and -- and redeploy them to other projects.

Nickelson Dep. at 113-114:19; *see also id.* at 115:2.

30)    HCS had no reason to believe the directive from Arraycon was motivated by race, national origin, or any other unlawful factor. Burns Decl. at 11; Nickelson Dep.. 115:5-8. HCS was well aware that Arraycon was unhappy with production and workmanship issues going into COVID (*see* Nickelson Decl. at ¶ 6); HCS was aware of the legitimate concern expressed by the stakeholders at Rambler that the majority of the positive cases were concentrated within this crew and workers feared being exposed (*see id.* at ¶ 9); and HCS was aware from multiple sources (Signal, Arraycon, and the County) that members of this crew had been observed on multiple occasions violating COVID protocols. Nickelson Decl. ¶¶ 12-13; Burns Decl. ¶ 12.

31)    HCS listed the reason for termination as "reduction in man force" so the HCS employees could immediately file for unemployment, which is a common practice in the staffing industry. Nickelson Dep. at 108:3-19.

32)    HCS removed the crew, which included Plaintiffs, from the Rambler site on May 12, 2020, at the direction of Arraycon. Nickelson Decl. ¶ 13; Burns Decl. ¶12, Ex. 3, 4 (HCS_08294 -8295; HCS_08297-08304).

33)    HCS immediately worked to get these workers re-assigned to other projects. Nickelson Decl. ¶ 13, Ex. 12, (HCS_19722) (showing that HCS prioritized re-hiring members of the Haitian crew who were laid off). The crew was instructed in the layoff message to contact their recruiter. Michel Dep. at Ex. 12.

34)    In fact, Plaintiff Michel received an email from an HCS recruiter the same day he received the layoff notification offering him other HCS jobs and asking him to rank his preferred jobsites. Michel Dep. at Exs.16-17.

35)     The vast majority of members of the roughly 50-person Haitian crew that was laid off on May 12, 2020, were re-hired by HCS. The re-hired individuals were Black and/or Haitian.[8]

36)     Even after the May 2020 Rambler layoff involving the Plaintiffs, HCS continued to employ Black individuals at the Rambler site, including Kendall Roberson, the Director of Safety, and Daphline Filostin, an on-site administrator who, is Black and Haitian. *See* Nickelson Dep. at 147:8-11 (noting that Kendall Roberson is black); *Id.* at 142: 13-19 (describing Kendall Roberson is employed by HCS onsite); *see also* Burns Decl. ¶ 17; Michel Dep. at 191:2-9 (confirming Filostin is Haitian).

37)     Following the May, 2020 Rambler layoff that involved the Plaintiffs, HCS continued to employ large Haitian crews on its jobsites. Nickelson Decl. ¶ 5; Burns Decl. ¶ 17. Individuals who had been laid off alongside Plaintiffs even returned to the Rambler project for HCS to assist in its completion. *See id*; *see also* Burns Decl. at ¶ 18, Ex. 3-4 (layoff list), Ex. 6 (Haitian employees that were laid off working on the project in July 2020).

### G.  Complaint and Investigation

38)     Plaintiff Michel raised an issue with his termination almost immediately after it happened. Backtracking on his original excitement to work with Defendants, Michel's sentiments towards HCS and the Rambler project quickly and surprisingly soured. Michel Dep. Ex. 16 (ranking preferences for other HCS job sites); *cf.* Elder Decl. at Ex. 1 (alleging racial discrimination on May 13, 2020 circa 3:00AM). None of the other Plaintiffs ever made a complaint to HCS apart from the initiation of this lawsuit.

---

[8] Nickelson Decl. ¶ 14, Ex. 13 (HCS_24469, HCS_24489, HCS_24484, HCS_24474, HCS_24466, HCS_24458, HCS_24451, HCS_24446, HCS_24443, HCS_24440, HCS_24439, HCS_24438, HCS_24436, HCS_24435, 24429, HCS_24423, HCS_24421, HCS_24420, HCS_24419, HCS_24410, HCS_24408, HCS_24404, HCS_24401, HCS_24400, HCS_24399, HCS_24398, HCS_24395, HCS_24392, HCS_24342, HCS_24344, HCS_24357, HCS_24360, HCS_24364, HCS_24370, HCS_24378, HCS_24380, HCS_24390).

39)     Defendants responded to Plaintiff Michel's internal complaint and Plaintiffs' lawsuit. Nickelson Dep. at 123:9–124:4; Nickelson Decl. ¶ 16; Elder Dep. at 97:2–99–14; Elder Decl. ¶ 6 and Ex. 1. Immediately upon receipt of Michel's communication dated May 13, 2020, HCS escalated the issue to RigUp's human resources department, which acted immediately to investigate Plaintiff Michel's claims. Nickelson Decl. ¶ 16; Elder Dep. at 97:2–99–14; Elder Decl. ¶ 6 and Ex. 1. HCS representative Shawna Melton contacted Plaintiff Michel as part of her investigation, but his attorney responded on his behalf. Elder Dep. at 97:2–99–14; Michel Dep. 199:22-200:14. From there, the matter was turned over to the legal department for handling. Nickelson Decl. ¶ 16; Elder Dep. at 97:2–99–14; Elder Decl. ¶ 6 and Ex. 1. No other Plaintiff lodged an internal complaint.

40)     Plaintiffs filed their Complaint initiating this lawsuit on August 3, 2021. ECF No. 1. Throughout every amendment of their Complaint and the discovery conducted to date in this case, Plaintiffs have and continue to allege that the May 12, 2020 layoff was discriminatory solely because 50 Haitians were let go. *See* Louis Dep. 160:22-161:11; *see also* Frederic Dep. 24:11-26:8; *see also* Michel Dep. 298:13-21; *see also e.g.* ECF No. 73 at ¶¶ 78-83.

### III.     ARGUMENT AND AUTHORITIES

**A. Defendants Did Not Form a Single, Integrated Enterprise Because Defendants Were Distinct Entities and HCS Made Its Own Employment Decisions, Including the Decision to Layoff Plaintiffs.**

It is a high bar to prove that two distinct legal entities (even where they form a parent-subsidiary relationship) form a single, integrated enterprise to impose joint liability related to alleged employment discrimination. Any evidence and allegations Plaintiff could potentially muster falls far short of that standard.

"[S]uperficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise: a single employer. Factors considered in determining

whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983). This criterion has been further refined such that "[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, 611 F. Supp. 3d 363, 380 (W.D. Tex. 2020), (citing *Trevino,* 701 F.2d at 404).

The "interrelation of operations" factor is akin to proving the stringent burden that the two entities are alter egos. Specifically, this factor focuses on whether the parent corporation excessively influenced or interfered with the business operations of its subsidiary (exercised a degree of control beyond that found in a typical parent-subsidiary relationship). The relevant factors include if the parent company: (a) was involved directly in the subsidiary's daily decisions related to production, distribution, marketing, and advertising; (b) shared employees, services, and equipment with the subsidiary; (c) commingled bank accounts, accounts receivable, inventory, credit lines with the subsidiary; (d) maintained the subsidiary's books; (e) issued subsidiary's paychecks; and (f) prepared and filed subsidiary's tax returns. *Perry*, 611 F. Supp. 3d at 382.

Here, despite being owned by Workrise, HCS remained a separate entity and it operated as such. *Supra* II. ¶ 2. Critically, as to the most important consideration, only HCS made the final decision to lay off the Plaintiffs. Burns Decl. ¶ 2; Elder Decl. ¶ 4. The other, less important factors, also weigh heavily against finding a single, integrated enterprise. HCS was still run by its original founder, Ron Nickelson. Elder Dep. at 24; Nickelson Decl. ¶ 1. Workrise had a distinct Executive Team and Nickelson was not part of it. Elder Decl. ¶¶ 2-3. Other than sharing some back-office support (email domain hosting, HR staff, etc.), HCS operated as a distinct entity in control of its

own business and employees. Elder Dep. at 24. HCS conducted its own business related to staffing; kept separate bank accounts, accounts receivable, etc.; maintained its own books; paid its employees; and signed its employees' paychecks. Elder Dep. at 22, 31-33, 35, 49-50; Elder Decl. ¶¶ 4-6. Decisions about labor relations of field employees were confined to HCS. Burns Decl. ¶ 2.

The type of evidence necessary to prove a single, integrated enterprise is much more than common ownership and sharing some back office/administrative support. In *Trevino*, the workers regularly transferred employment between the two companies, and, *on hundreds of occasions*, the parent company's management authorized the layoffs, promotions, and transfer of the subsidiary's employees. Here, the evidence is overwhelming that HCS and Workrise are not a single, integrated enterprise. *Perry*, 611 F. Supp. 3d at 383.

## B. HCS[9] Is Entitled to Summary Judgment on Plaintiffs' Title VII and § 1981 Claims.

Plaintiffs must prove their Title VII and § 1981 claims either through direct or circumstantial evidence; however, there is no evidence to support a direct evidence case and Plaintiffs' circumstantial evidence cannot overcome HCS's legitimate, non-discriminatory reasons for their termination.

### 1. Plaintiffs have no evidence to support direct discrimination.

There is no evidence to support a direct evidence case. "Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption . . . . It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Gaalla*, 460 F. App'x at 479 (internal quotations omitted).

---

[9] As addressed above, Workrise (previously RigUp) did not take part at all in the employment decisions complained of by Plaintiffs and thus, Defendants do not form a single, integrated employer. But if the Court finds Defendants formed a single, integrated employer, the proceeding sections of the Motion would apply to both Defendants, not just HCS.

However, a direct evidence case is more than the mere conclusion of discrimination. "[T]o qualify as direct evidence of discrimination, an employer's comment 'must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee.'" *Read v. BT Alex Brown Inc.,* 72 Fed. Appx. 112, 119 (5th Cir. 2003) (quoting *EEOC v. Texas Inst. Inc*., 100 F.3d 1173, 1181 (5th Cir. 1996)). Remarks "relat[ing] to the protected class of persons of which the plaintiff is a member," near in time to plaintiff's allegedly discriminatory termination, "made by an individual with authority" over the decision, and related to the decision may constitute direct evidence of discrimination. *Jackson v. Cal–Western Pack.*, 602 F.3d 374, 380 (5th Cir. 2010).

Plaintiffs will likely point to an email from Bob Schiel (a former HCS superintendent) related to a separate incident three months prior to Plaintiffs' layoff and alleged statements from Phillip Sirrat. Defendants do not contest that the alleged statements from these gentlemen to another former HCS employee several months before the relevant time period is inexcusable if true. However, these two individuals were not "individual[s] with authority" and were not part of the decision to lay off the Plaintiffs. *Id.*; *Quintana v. Fujifilm N. Am. Corp*., 96 F. Supp. 3d 601, 613 (N.D. Tex. 2015), aff'd, 628 Fed. Appx. 252 (5th Cir. 2015); *see also* Burns Decl. ¶¶ 19-20. Any improper statements from former employees that Defendants expressly and unambiguously disclaim (if true), also were not near in time to the layoffs at issue. *See Felts v. Combined Ins. Co. of Am.*, No. 3:98-CV-2875-G, 2000 WL 21317, at *3 (N.D. Tex. Jan. 11, 2000) (holding that six months was not near in time at least in pretext analysis). Lastly, any alleged improper statements were not related to the decision to lay off the Plaintiffs. *Quintana*, 96 F. Supp. 3d at 613. Accordingly, there is no evidence to support a direct evidence case.

### 2. HCS Had Legitimate, Non-Discriminatory Reasons for the Layoff, and Plaintiffs Cannot Show Pretext.

HCS concedes that Plaintiffs' allegations are sufficient to plead a *prima facie* case and won't burden the Court with that analysis.[10] Under the *McDonnell Douglas* burden-shifting framework, the burden then shifts to HCS to show a legitimate, non-discriminatory reason for laying off Plaintiffs. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021).

### 3. Summary Judgment Standard for Circumstantial Evidence under the Burden-Shifting Framework.

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Brooks*, 70 F. Supp. 3d at 831 (quoting *Reeves*, 530 U.S. at 143).

"[T]o satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue material fact the reason was: (1) not true, but a mere pretext for unlawful discrimination or retaliation (pretext alternative); or (2) true, but only one of the reasons for its conduct, and another motivating factor is the plaintiff-employee's protected characteristic." *Hemphill v. Weststar Autoplex*, 2022 WL 21768167, at *4 (citing *Keel*, 2012 WL 3263575, at *7).

Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the

---

[10] "In a RIF case alleging intentional discrimination based on a [sic] age, race, or national origin, a plaintiff makes out a prima facie case by showing: (1) that he is within the protected group; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Quintana*, 96 F. Supp. 3d at 613. Notably, however, the only evidence supporting prong four is that the entire crew that was laid off happened to be Haitian. *See, e.g.*, Louis Dep. at 160:22-161:11.

employer's explanation is false, and any other evidence that supports the employer's case' " that properly may be considered by the court when ruling on a motion for summary judgment. *Brooks*, 70 F. Supp. 3d at 832–33 (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)).

### 4. The Client's Request to Remove a Crew Based on Legitimate COVID Concerns That Had Been Corroborated By Multiple Sources Is a Legitimate Non-Discriminatory Reason for Plaintiffs' Removal From Rambler.

HCS laid off the Plaintiffs not because of their race or national origin but because Arraycon, its client, requested that their crew, which happened to be Haitian, be removed due to serious concerns regarding COVID and how continued violations could impact the project. *Supra* II. ¶ 29. HCS had no reason to question the veracity of why Arraycon was asking for removal of this crew— after all, the vast majority of the positive COVID cases were within this crew and they had received multiple reports from Signal and the county that members of this crew were violating protocols. *Supra* II. ¶ 30. At this stage of the pandemic—as seen with the Titans even months later—people were afraid of being exposed to COVID because it was so contagious and remained a mystery. Accordingly, HCS made the legitimate business decision to agree with this request, and it had nothing to do with the crew's race or national origin. *Supra* II. ¶ 32.

"The defendant may meet this burden by presenting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08 (1993)). "The employer at this stage need only produce a reason as opposed to evidence and is not subjected to 'credibility assessments.'" *Hemphill v. Westar Autoplex, LLC*, at *4 (citing *Davis*, 2020 WL 1325201, at *9).

HCS is a staffing company. HCS's job was to provide staffing to subcontractor on large solar projects. *Supra* II. ¶ 11. Part of the client relationship permits the customer to request replacement of a crew that isn't working so long as the request is based on lawful reasons.

Nickelson Dep. at 65:17-66:23. And that's what happened here. Arraycon became increasingly frustrated with the Haitian installer crew. It started with production issues pre-COVID after many solar panels were installed backwards, which resulted in the need for additional quality control and delayed the production schedule. *Supra* II. ¶ 13, 14.

Then, after COVID hit, county health officials, Signal, Arraycon, and HCS implemented protocols to ensure the safe, continued operation of the Rambler project. *Supra* II. ¶ 18. However, that process too because frustrated. In mid-April, the Haitian crew that Plaintiffs were part of, and only that crew, was observed on two consecutive days not following the COVID protocols. *Supra* II. ¶ 20. Then, in late April, 8 out of 9 HCS employees initially tested at the Rambler project had tested positive for COVID. *Supra* II. ¶ 22. Each of those individuals were part of the Haitian crew, including Plaintiff Frederic. Because of the sudden spike in positive tests (within the Haitian crew), Signal implemented a site-wide safety stand down and shut down the Rambler site on April 27, 2020. *Supra* II. ¶ 23. Following the testing, the county health department conducted contact tracing to evaluate when and whether the site could safely re-open. During the testing shutdown and quarantine period, Tom Green County reported that it observed many members of the Haitian HCS crew violating the quarantine and isolation orders in place. *Supra* II. ¶¶ 26-27.

Arraycon was getting pressure from its general contractor and government authorities (including threats of shutting down the entire project) due to the persistent breaches of COVID protocols, and accompanying positive COVID tests, predominantly from one group: the Haitian installer crew. Indeed, Nickelson, HCS's founder, was threatened with a bench warrant by Tom Green County due to these issues. Nicelson Dep. 46:24–47:2, 68:14–68:17. For all these reasons—all of which are legitimate, non-discriminatory reasons, Arraycon asked that HCS replace the crew that was threatening their ability to get the site opened and get people back to

work safely and without fear of exposure. *Supra* II. ¶ 29. HCS found Arraycon's request to be reasonable in light of the circumstances and information available, which corroborated Arraycon's concerns. *Supra* II. ¶ 30. This shifts the burden to Plaintiffs to prove HCS's proffered reason was pretext for discrimination.

**5.  Plaintiffs Do Not Have Sufficient Evidence To Support Pretext.**

HCS had a legitimate, nondiscriminatory business decision for approving Arraycon's request to lay off the Haitian crew. Plaintiffs will likely seek to focus the Court's attention on prior, unrelated actions by non-decision makers and an investigation that was stalled by Plaintiff Michel immediately lawyering up and demanding payment for alleged discrimination. Such "evidence" is not evidence of pretext sufficient to survive summary judgment. Critically important to the issue of pretext is: 1) HCS did not lay off Black and Haitian employees at Rambler who were not part of the HCS installer crew that was the subject of the COVID concerns (*Supra* II. ¶ 36)  and, 2) HCS tried to bring back the Haitian installer crew on other projects immediately thereafter, and was successful for a majority of the crew, who were re-employed by HCS. *Supra* II. ¶ 37.

To satisfy their burden, a plaintiff must produce "substantial evidence" that the employer's proffered reasons for its actions were a pretext for discrimination. *Delaval*, 824 F.3d at 480 (citing *Burton v. Freescale Semiconductor, Inc*., 798 F.3d 222, 233 (5th Cir. 2015)); *see Head v. City of Columbus Light & Water Dep't*, 746 F. App'x 389, 392 (5th Cir. 2018); *Outley*, 840 F.3d at 216.

Throughout depositions in this case, Plaintiffs did not focus on disproving Arraycon and HCS's justification for the layoffs, but rather on a single email from Bob Schiel and alleged statements from Phillip Sirrat, both of which occurred months before the layoff. Even if Defendants agree that the alleged statements from Scheil and Sirrat are unprofessional and inexcusable, Schiel and Sirrat were not involved in the decision to termination Plaintiffs whatsoever.

Pretext is shown "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016). "While temporal proximity alone can establish the 'causal connection' element of a prima facie case, 'it is insufficient to demonstrate pretext.'" *Shahrashoob v. Texas A&M University*, 2023 WL 8238192, at *5 (quoting *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 306–07 (5th Cir. 2020)). The plaintiff must produce substantial evidence supporting pretext and "rebut each nondiscriminatory reason articulated by the employer." *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003).

**No disparate treatment**. Plaintiffs would need to show Defendants "treat[ed] one employee more harshly than other 'similarly situated' employees for nearly identical conduct." *Edrich v Dallas College*, at *13 (quoting *Vaughn*, 665 F.3d at 637) (internal quotations omitted). Here, before Plaintiffs were laid off, HCS terminated prior employees for failure to follow COVID protocols. *Supra* II. ¶ 19. Then, the Plaintiffs' crew was observed by multiple disinterested third parties breaching COVID protocols onsite and offsite, and that crew represented the majority of positive results. *Supra* II. ¶¶ 20, 26, 28. Accordingly, the client requested the entire crew be removed from the project. *Supra* II. ¶ 29. Notably, HCS did not remove other Black and Haitian employees onsite that were not part of the installer crew subject of the client's complaints. *Supra* II. ¶ 36. Furthermore, HCS wanted to keep employing Plaintiffs and their Haitian crew members on other jobsites, offering to rehire and ultimately rehiring most of the crew. *Supra* II. ¶¶ 35, 37. Accordingly, Plaintiffs cannot show disparate treatment. *Edrich*, at *13

**Worthy of credence**. Following repeated, documented instances of breaches in COVID protocols from HCS's client, the general contractor, and county health officials, and the undisputed

COVID results supporting a higher exposure risk within this crew, there was no reason to doubt the credence of the allegations that formed the basis of Arraycon and HCS's decision.

Notably, HCS "d[id] not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc*., 413 F.3d 471, 478 (5th Cir. 2005); *see also Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018) (in the "pretext analysis, the court does not 'engage in second-guessing of an employer's business decisions.'") (quoting *LeMaire v. La. Dep't. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)).

Plaintiffs may argue they didn't breach protocols, though the objective evidence suggests otherwise, that is immaterial. HCS's decision to lay off the Plaintiffs was not a pretext for discrimination but was based on a sound business decision. *Owens v. Circassia Pharmaceuticals, Inc*., 33 F.4th 814, 830 (5th Cir. 2022) (finding that even if the plaintiff had presented sufficient evidence suggesting that her employer's proffered reason might be false, summary judgment was nevertheless warranted because no rational factfinder could conclude that the action was discriminatory); *Mayberry*, 55 F.3d at 1091; *Owens*, 33 F.4th at 830 ("The question is not whether an employer made an erroneous decision; it is whether the [adverse] decision was made with a discriminatory motive."). Accordingly, Plaintiffs cannot carry their burden to demonstrate HCS's decision was pretextual.

### 6. Plaintiffs Cannot Overcome the Strong Presumption That There Is No Pretext Because HCS Did Not Fire Black/ Haitian Employees At Rambler Who Were Not Installers and HCS Tried to Rehire the Laid Off Haitian Crew.

Not only is there insufficient evidence for Plaintiffs to overcome the base-level burden to prove pretext in the typical burden-shifting framework, but there is an extra burden on Plaintiffs here where the context surrounding the layoffs further proves the decision was not pretextual. HCS's decisions are entitled to the same-actor inference because the same ultimate decision maker at HCS hired and laid off the Plaintiffs and the Haitian crew. Even more, HCS offered to rehire

the Haitian crew, and did rehire most of them. *Supra* II. ¶ 35. HCS even brought back several members of the crew to finish the Rambler job once the COVID concerns had subsided. *Supra* II. ¶ 37. Thus, the rebuttable presumption afforded by the same-actor inference is even stronger here than a typical case where there's evidence of offering to rehire the employee to a different site at the same time as removing them from this project.

The same-actor inference is drawn in favor of the employer-defendant moving for summary judgment, "create[ing] a rebuttable presumption that ethnic or racial animus is not present. *Quintana*, at *9 (quoting *Spears*, 337 F. App'x 421–22). The same-actor inference applies when the same supervisor is involved in both the hiring and firing of the employee(s) in question. *Id.*

Here, HCS meets the typical situation: the same person authorizing the termination also authorized hiring. But, there's another unique level to this inference: HCS also offered to rehire the Haitian crew and successfully rehired most of them. In fact, Plaintiff Michel was offered a new job with HCS the same day. *Supra* II. ¶ 34. Counsel has not been able to find a single case where an employee alleges they were terminated for discriminatory reasons but at the same time offered to be rehired to the same position just at a different location (or any similar scenario). Likely because it defies logic to discriminate on the basis of race or national origin when the employer is making attempts to retain that employee, just at a different location—especially by a staffing company, where the nature of the work is temporary and demands movement from jobsite to jobsite. Thus, HCS's conduct even more strongly supports the application of the same actor inference than the typical situation because it offered to rehire the employees it allegedly removed from the project for discriminatory reasons, ultimately rehired most of the Haitian crew, and didn't

fire multiple other Black and Haitian workers on site (who were outside the crew causing COVID concerns for the client). *Davis*, 2020 WL 1325201, at *9, *15.

**C. Plaintiffs' Section 1981 Claims Should be Dismissed Because the Gravamen of the Claim Is for National Origin Discrimination, Not Racial Discrimination.**

Fifth Circuit precedent is clear: in order to bring a § 1981 claim, the alleged discrimination cannot be based on national origin. The crux of Plaintiffs' claims is that they were discriminated against based on their national origin (Haiti), not race. Thus, even to the extent Plaintiffs have brought enough evidence to demonstrate direct or circumstantial evidence of discrimination (which they have not, *supra*) only their Title VII claim should proceed, not their § 1981 claim.

"To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute. . . ." *Hadad v. Am. Airlines, Inc.*, 2003 WL 292170, at *2 (N.D. Tex. Feb. 7, 2003) (Fitzwater, J.) (citing cases).

The Fifth Circuit's interpretation of §1981's guidance limits its protection to racial discrimination claims. *Kathy Nguyen v. Brink's, Inc.*, No. 3:18-CV-00235-N, 2019 WL 130284, at *2-3 (N.D. Tex. Jan. 8, 2019). "It does not afford protection to claims of discrimination based purely on national origin." *Id.* Distinguishing between these two claims can be "quite difficult." *Id.* The line between discrimination based on ancestry and ethnic characteristics and discrimination based on place or nation of origin is not a bright one. *St. Francis Coll*, 481 U.S. 604, 614 (1987) (Brennan, J. concurring). The role of the Court, however, is to determine which claim predominates. *Id.* Claims that are more akin to assertions of national origin discrimination than to race discrimination cannot be brought under § 1981. *Hadad*, 2003 WL 292170, at *2 (N.D. Tex. Feb. 7, 2003).

1.  **Plaintiffs' Testimony Demonstrates That National Origin Discrimination Predominates Their Claims.**

Plaintiffs' testimony illuminates that the thrust of their complaint is that they were laid off because they are from Haiti. Stated differently, the alleged discrimination they encountered (the layoff) was because of their national origin. The record is replete with examples.

"Even though race and national origin discrimination can be quite difficult to distinguish from one another, the court's task is thus to determine which claim predominates." *Kathy Nguyen v. Brink's, Inc.*, No. 3:18-CV-00235-N, 2019 WL 130284, at *2 (N.D. Tex. Jan. 8, 2019).

When asked about her allegations of discrimination, Plaintiff Guerda Louis claims it was exclusively because of her national origin:

> Q: Now, do you, Guerda Louis, though have any first hand personal knowledge as to the reason those other workers were removed from the—the site?
>
> A: For discrimination.
>
> Q: Okay. What's your basis for that?
>
> A: Because they fire 50 Haitian people and hire 50 other people—50, **and other nations**, to finish the job. . . .
>
> Q: **And is that discrimination based exclusively on your Haitian heritage?**
>
> A: **Yes.**[11]

In other words, the gravamen of Louis's complaint is that she was discriminated against based on her national origin, not race. Plaintiffs Ralph Frederic and Clifford Michel further confirm the crux of their claims are nationally-based:

-   Michel: "We got fired because we Haitian." Michel Dep. at 298:21.[12]

-   Frederic: "all [the foreman's] treatment and words were against us Haitians, not any other people working in there but Haitians." Frederic Dep. at 15:24-16:1.[13]

---

[11] Louis Dep. at 160:22-161:11. (emphasis added)
[12] Michel Dep. at 77:21-78:13; Michel Dep. at 293:7-16.
[13] Frederic Dep. at 22:13-14; Frederic Dep. at 25:5-26:8.

Critically, this is consistent with the context surrounding the layoffs. As addressed above, the decision was legitimate and nondiscriminatory. And other Black/ Haitain HCS employees who worked at Rambler outside of the installer crew posing a COVID threat were not fired. *Supra* II. ¶ 36.

Thus, to the extent Plaintiffs could overcome their burden to show pretext (they can't), their claims are for alleged discrimination based on national origin, which can only be brought under Title VII. *Kathy Nguyen*, 2019 WL 130284, at *2; *Davis v. RealPage, Inc.*, No. 3:18-CV-0986-D, 2020 WL 1325201, at *9, *15 (N.D. Tex. Mar. 20, 2020) (although claiming discrimination based on being African-American and Kenyan, Court granted summary judgment on § 1981 claims as sounding in national origin and for lack of pretext where there were other employees that were African-American but non-Kenyan that were not discriminated against); *Hadad*, 2003 WL 292170, at *2 (N.D. Tex. Feb. 7, 2003) (dismissing § 1981 claims because although Plaintiff alleged he was discriminated against based on race and national origin—claiming he was terminated because "he [wa]s an 'Arab *from* Iraq"—his claims were "more akin to an assertion of national origin discrimination than of race discrimination.").

## IV.    CONCLUSION

Defendants' Motion should be granted in three respects: 1) all claims against Workrise should be dismissed because Plaintiffs cannot show the Defendants formed a single, integrated employer; 2) all claims should be dismissed because HCS had a legitimate, nondiscriminatory reason for the layoffs to which Plaintiffs cannot overcome their burden to show pretext; and 3) even if Plaintiffs' could show pretext, their § 1981 claims should be dismissed because they sound in national origin.