## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **CLIFFORD MICHEL** *et al.*, | § | |
| | § | **Civil Action 1:21-cv-681** |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WORKRISE TECHNOLOGIES INC.** *et al.*, | § | |
| | § | |
| *Defendants.* | § | **JURY DEMANDED** |

### PLAINTIFFS' RESPONSE TO
### DEFENDANTS' MOTION SUMMARY JUDGMENT

TO THE HONORABLE DUSTIN M. HOWELL:

Plaintiffs Clifford Michel, Guerda Louis, and Ralph Frederic (collectively, "Plaintiffs") respond to Defendants Workrise Technologies, Inc., and HCS Renewable Energy LLC (collectively, "Defendants") Motion for Summary Judgment. The motion should be denied because of the existence of genuine disputes of material facts for trial.

### NATURE AND STAGE OF THE PROCEEDING

This is a civil rights case. Defendant managers terminated hardworking employees because of their race. The actions violate the Civil Rights Act of 1866 (42 U.S.C. § 1981). Trial is set for August 5, 2024.

### PRESERVATION OF ERROR

Defendants failed to submit their motion for summary judgment within the original time ordered by the Court. Defendants moved to substitute new counsel. Plaintiffs objected to the substitution only if it would cause the deadlines to be moved to the prejudice of Plaintiffs. Dkt.

*Response to Motion for Summary Judgment*        *Page 1*

88. The Court overruled the objection to new counsel. Dkt. 91. The new counsel then moved to extend deadlines in the scheduling order, including the dispositive motion deadline which had passed. Dkt. 94. Plaintiffs objected to the extension of the deadlines on the grounds that Defendants did not show or meet the factors required in *S&W Enters., LLC v. Southtrust Bank of Ala., NA,* 315 F.3d 533, 535 (5th Cir.2003). Dkt. 100. Plaintiffs objected to the rescheduling of the passed dispositive motion deadline again in the joint scheduling report. Dkt. 117. The Court granted Defendants' motion to extend the deadlines, including the dispositive motion deadline. Dkt. 123. Plaintiffs expressly hereby reserve their argument that Defendants have not met the requirements failing to timely file a dispositive motion or to extend the time to file a motion and assert that Defendants' motion for summary judgment should be denied as untimely.

## SUMMARY

In 2019, Defendants began to place workers at worksite in San Angelo, Texas to install solar panels. HCS was the designated employer of the workers, relying on its parent company, Workrise, for any significant employment matters such as discrimination complaints or termination.

Defendants segregated the employees by race: Haitians, Hispanic, and White. The Haitians included, Jamaicans, and other Caribbean persons. Defendants generally referred to the Caribbean workers as the Haitians. At a site in San Angelo known as the Rambler project, Defendants used Hispanics and Black Haitians, segregating the Haitians from the Hispanics based on cultural and language differences. Defendants acknowledged that the Haitians were the hardest workers; however, Defendants treated the Haitian workers worse than the Hispanic workers by paying them less and speaking to them derogatorily, calling them the N-word and Black-*ss. On

January 31, 2020, the Haitians protested the discrimination en masse. Defendants characterized the protest against discrimination as a "war" to fight rather than correct.

When COVID broke out, many of the Hispanic workers ignored safety protocols while the Haitians generally followed them. Defendants, along with Defendants' customers, ignored the violations of Hispanic workers and used alleged safety concerns to terminate or transfer all of the Haitian workers from the Rambler project, generalizing about the safety of one race of employees over another. As a cover up for the discriminating against the Haitians in the decision to terminate or transfer all of the them, Defendants and their customers knowingly fabricated an allegation that the Haitian workers generally violated COVID protocols more than other workers.

### THE MAJOR DISPUTED FACT

Defendants do not dispute that the Haitians are Black and qualified for their positions. Defendants do not dispute that all of the Haitians were removed from the Rambler project by either termination or transfer and replaced by Hispanic or non-Black employees. The major disputed fact is the reason given by Defendants for removing all of the Haitians on the Rambler project. The reason given in Defendants' motion is that their client requested the Haitians to be removed because of COVID safety concerns.[1] This reason is disputed on several grounds.

---

[1] In its motion for summary judgment, Defendants attempt to dismiss racial discrimination as a part of some noble effort to enforce COVID restrictions. Defendants attempt to draw a parallel to the National Football League ("NFL") penalizing the Tennessee Titans football team for violating COVID protocols to paint this narrative. Defendants state that because the NFL fined the entire team, it is also engaging in similar behavior by firing fifty Haitian people who were also accused of violating COVID regulations. Defendants' argument falls short. In its motion, Defendants omit out that although the NFL fined the Tennessee Titans team franchise, the NFL ruled out fining individual team members, and no player faced any severe penalty based on the NFL's findings that the team violated COVID rules. *See* Mark Maske, Tennessee Titans fined $350,000 by NFL for coronavirus protocol violations, THE WASH. POST (Oct. 25, 2020). https://www.washingtonpost.com/sports/2020/10/25/tennessee-titans-fined-coronavirus/.

The first is that Defendants had been discriminating against the Haitians from the outset and Defendants do not give a reason justifying the treatment. The second is that the previous and continuing discrimination belies the excuse given for the ultimate action of termination or transfer. The third is evidence that Defendants and its customers knew that the Haitians were generally more compliant than the Hispanic workers who were not terminated or transferred. The fourth is that the 575 workers, only 21 tested positive for COVID: 3.6 percent. Dkt. 152 at Page 127 [Vretis 45:2-5]. Eight of those persons were Haitians; however, before any of the Haitians tested positive, Defendants required them to ride in the same van together at work. Exhibit 7. The fifth is that treating all Haitians as a group based on the actions of a few is discriminatory. The sixth is that much of the evidence Defendants rely upon is hearsay and most is conclusory.

## ARGUMENT

**LEGAL STANDARD**

For a motion for summary judgment to be granted, the movant must show "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254* (1986). In considering the evidence to determine a motion for summary judgment, courts must:

- draw all reasonable inferences in favor of the nonmoving party;

- not make any credibility determinations or weigh the evidence;

- disregard all evidence favorable to the moving party that the jury is not required to believe; and

■ give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent the evidence comes from disinterested witnesses.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

**THE CIVIL RIGHTS ACT OF 1866**

The significance of the Civil Rights Act of 1866 (Section 1981) is immeasurable. Congress passed the Act to give "practical effect and force" to the Thirteenth Amendment. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 434 (1968) (quoting a Congressional comment, Cong. Globe, 39th Cong., 1st Sess., 43). Congress believed it "was approving a comprehensive statute forbidding *all* racial discrimination affecting the basic civil rights enumerated in the Act." *Id.* at 435. The purpose of the Fourteenth Amendment, at least in part, was to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States. *Id.* at 436. Indeed, the Civil Rights Act constituted an initial blueprint for the Fourteenth Amendment. *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 721 (1989) (*quoting Gen. Bldg. Contractors Ass'n., Inc. v. Pa.,* 458 U.S. 375, 389 (1982)). The constitutional policy behind the act is of the utmost importance to the United States, obtained after a war underpinned by the dedication to the proposition that all men are created equal. And to a deeper belief, that they are endowed by their Creator with certain unalienable rights.

Although the Civil Rights Act of 1964 (Title VII) was passed almost a hundred years later, the analysis of claims for employment discrimination under Title VII and § 1981 are identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies. *LeBlanc*

*v. Greater Baton Rouge Port Comm'n*, 676 F. Supp. 2d 460, 470 n.38 (M.D. La. 2009) (*citing Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987, 992 (5th Cir.2005); *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 651 (5th Cir.2004)).

**THE WORKRISE ISSUE**

Workrise may be held liable under three legal concepts: 1) direct participation in the discrimination; 2) as a de facto employer; and 3) as an integrated enterprise with HCS.

**Direct Participation**

Persons who exercise control in the employment decisions at issue are indistinguishable from the employer in those decisions. *Miller v. Wachovia Bank, N.A.*, 541 F. Supp. 2d 858, 862 (N.D. Tex. 2008). *See Foley v. Univ. of Hous. Sys.,* 355 F.3d 333, 337 (5th Cir. 2003) (If a fact issue exists, as the District Court found, as to whether individuals exercised control over the employment positions, then the individuals were essentially the same as the employer); *Mitchell v. Nat'l R.R. Passenger Corp.,* 407 F. Supp. 2d 213, 228 (D.D.C. 2005) (listing cases and discussing *Foley*).

Evidence exists that Workrise directly participated in the investigation of the Plaintiffs' discrimination complaints and their termination or transfer. Workrise was known as "RigUp" until it rebranded as "Workrise." Sealed Exhibit 1 [Elder 22:4-5]. Workrise acquired HCS in December 2019. Sealed Exhibit 1 [Elder 22:6-8]. HCS is a staffing company that provided labor for the project in San Angelo on which Arraycon Construction, LLC was working, known as the Rambler project. Sealed Exhibit 1 [Elder 22:14-23:2]. Arraycon was a client of HCS. Sealed Exhibit 1 [Elder 22:8-9]. Another entity known as "Walker" was also a client of HCS on the project. Sealed Exhibit 2 [Nickelson 13:6-15:4]. Arraycon and Walker were subcontractors for

Signal Energy Constructors, the general contractor for the Rambler project. Sealed Exhibit 2 [Nickelson 13:6-15:4].

Workrise provides "back-office support to HCS." Dkt. 153 at Page 5 (p. 4). For ex

ample, Workrise is involved if a complaint rises to the level of discrimination. Dkt. 152 at Page 515 [Nickelson 26:17-24]. An HR complaint naturally goes to the "back-office personnel" of Workrise, which is the human resources or legal department of Workrise. Dkt. 152 at Page 516 [Nickelson 27:8-16]. After the acquisition of HCS by Workrise, HCS relied on Workrise's HR department. Dkt. 152 at Page 519 [Nickelson 36:2-8]. HCS did not have an HR department and used Workrise's HR department once Workrise purchased HCS. Dkt. 152 at page 489 [Burns 56:8-12]; Dkt. 152 at Page 519 [Nickelson 36:2-8].The assumption HCS's HR responsibilities began at the time it purchased HCS, before the Rambler project. Dkt. 152 at Page 518 [Nickelson 35:6-12]. HCS acknowledges a co-employee relationship with the payroll company, VensureHR, and Workrise acknowledged all HCS employees as their employees in late 2020 or 2021. Dkt. 152 at Page 507 [Nickelson 17:3-10]. President Nickelson testified that there were "technically" no HCS employees after Workrise's acquisition of HCS. Dkt. 152 at Page 551 [Nickelson 74:21-24]. By the Defendants' own standard practices and procedures, Workrise would have participated in significant HR decisions of HCS. Workrise would have investigated the discrimination complaints in January and February 2020, and then had the duty to correct and prevent any further discrimination. Workrise does not provide any evidence that it completed its investigations. Workrise did not prevent the discriminatory terminations or transfers in May 2020 and, by its own standard practices and procedures, would have had its HR or legal department participate in the terminations or transfers. A decisionmaker's awareness may be established by circumstantial

evidence. *Equal Employment Opportunity Comm'n v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017).

Workrise stated that it "tried to take action when it was…made aware of certain instances." Sealed Exhibit 1 [Elder 97:10-12]; Sealed Exhibit 8 [HCS_08921-2]. Shawna Melton, Workrise Human Resource Business Partner, opened and supported an investigation in May 2020 when Workrise receives a complaint of discrimination. Sealed Exhibit 1 [Elder 97:2-100:13]; Exhibit 8 [HCS_08921-2]. Multiple Workrise employees were consulted regarding Mr. Michel's complaint of discrimination. Exhibit 8 [HCS_08921-2]. Ms. Melton personally emailed Mr. Michel on behalf of Workrise to set up an interview about his discrimination complaint. Exhibit 9 [HCS_08971].

Another Black and Haitian solar panel installer in the same crew as the Plaintiffs made a discrimination complaint in May 2020, which was immediately escalated to Workrise. Exhibit 10 [HCS_08984-5]. In June 2020, a former HCS employee, Andrea Zepada, made a complaint of "persistent, perceived harassment, both sexual and racial, directed towards her and her crew," which was escalated to Workrise's HR department. Exhibit 11 [HCS_12114-5]. A reasonable jury can infer that back-office support includes involvement in daily employment decisions of field employees, participation in decisions of layoffs, transfers, and demotions, and assistance in controlling and supervising HCS field personnel, including Plaintiffs, and assisting with the day-to-day field operations of HCS. All of this involvement in the day-to-day and layoff decisions of Plaintiffs can occur without comingling or sharing bank accounts or issuing paychecks.

Workrise admits to involvement because it provides back-office support to HCS at the time of the Plaintiffs' termination, the time of the most significant discriminatory act. The

statement that Workrise did not have any daily involvement with HCS is conclusory and does not negate the back-office involvement admitted by Workrise.

The Burns and Elder declarations do not specifically say that Workrise was not included in the decision to terminate Plaintiffs. Allegations that HCS made the decisions regarding labor relations in the field without Workrise are conclusory and contradict the statement that Workrise provided back-office assistance. This is the same as saying Workrise was not part of the layoff. Leslie Elliot, Managing Director, managing director of Workrise under the name RigUp, ordered the shutdown of the Rambler site on April 27, 2020. Dkt. 152 at Page 60 [HCS_16962].

Defendants do not have admissible evidence that they received any direction by Signal, Arraycon, or a health official to shut down the Rambler site. Defendants have not presented any admissible evidence that anyone instructed Defendants to shut the site down because of COVID protocol or were instructed to shut down by Arraycon, Signal, or the county. The email attached as Exhibit 8 to Mr. Nickleson's declaration (HCS_16962) contains inadmissible evidence from Arraycon. Nevertheless, nothing in the statements by Arraycon required the site to be shut down, simply that individuals be tested for COVID. Nothing prevented the workers from continuing to work while being tested individually for fifteen to thirty minutes at some point during the day. The decision to shut the site down appears to have been made by Leslie Elliot, managing director of Workrise. Exhibit 12 [HCS_1962]. Evidence of involvement is supported by the escalation of a complaint by an HCS field worker to Workrise. Declaration of Elder Sealed Exhibit 1 (Dkt. #152) [HCS_24308-9].

Defendants do not present admissible evidence of any incorrect installation at the Rambler site. The emails upon which Defendants rely are inadmissible hearsay. At a minimum, a fact issue exists as to whether Workrise participated in the decisions.

**De Facto Employer**

Under Title VII of the Civil Rights Act of 1964, which is analogous to the Civil Rights Act of 1866, the Fifth Circuit applies a hybrid economic realities and common law control test to determine the actual employer status. *See High v. City of Wylie, Tex.*, 4:18-CV-364, 2020 WL 3972743, at *3 (E.D. Tex. July 14, 2020). The focus is on "the extent of the employer's right to control the 'means and manner' of the worker's performance." *Nowlin v. Resol. Tr. Corp.,* 33 F.3d 498, 505 (5th Cir. 1994). The control component focuses on whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee and the economic realities component of the test focuses on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Muhammad v. Dall. Cty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007) (footnotes omitted).

Workrise has control of employment decisions of workers hired by HCS when it involves higher level concerns such as discrimination or termination. Leslie Elliot, Managing Director of Workrise, negotiated the Imaware contract to test the Haitian employees. Dkt. 152 at Page 57 [HCS_16209]. This creates a fact issue as to the control component of the hybrid test. Although HCS paid the worker's salaries, withheld taxes, and provided benefits, a fact issue exists as to whether Workrise set the terms and conditions of employment for the workers through its back-office participation.

**Integrated Enterprise**

If the plaintiff is not found to be an employee of a defendant under the hybrid test, but questions remain whether an additional defendant is sufficiently connected to the employer-defendant so as to be considered a single employer, the court then applies the single employer/integrated enterprise test. *See Obinyan v. Prime Therapeutics LLC*, No. 3:18-CV-0933-D, 2021 WL 1017038, at *3 (N.D. Tex. Mar. 17, 2021), aff'd sub nom. *Obinyan v. Walgreens Specialty Pharmacy Holdings, L.L.C.*, No. 21-10294, 2022 WL 987183 (5th Cir. Mar. 31, 2022). Superficially distinct entities may be jointly liable for discriminatory acts in the employment context if they are found to be "a single, integrated enterprise: a single employer." *See id.* (citing *Skidmore v. Precision Printing & Packaging., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999) (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)).

The *Trevino* factors for an integrated enterprise are: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Id.* The second factor has traditionally been most important, with courts refining their analysis to the single question, What entity made the final decisions regarding employment matters related to the person claiming discrimination? *Id.* (quotations omitted). In this case, facts exist for all four factors.

Workrise and HCS have an interrelation of operations, centralized control of labor relations, and common management. HCS does not have an HR department and relies upon Workrise for back-office HR and legal support. Dkt. 152 at page 489 [Burns 56:8-12]; Dkt. 152 at Page 519 [Nickelson 36:2-8]. Higher level labor decisions are made with Workrise. Exhibit 7. A fact issue exists as to whether Workrise is control central for major employment decisions at HCS.

Additional facts also support the first three factors. HCS and Workrise email accounts were interchangeable.  HCS represents that it is "Powered by Rigup." *See* the signature block by Tristan Nickelson on Dkt. 152 at Page 9 [HCS_16723]. Tristan Nickelson, the Renewables Account Manager for HCS Renewables, Powered by Rigup, acts on behalf of Workrise as shown by his emails making decisions about Haitians from his RigUp email account. Dkt. 152 at Page 9 [HCS_16723]. Kendall Roberson, Senior Safety Manager, also directed safety protocols using Mr. Roberson's Workrise d/b/a RigUp email account. Dkt. 152 at Page 11 [HCS_15999]. Ron Nickelson, Founder and President of HCS, directed employees using his Workrise d/b/a RigUp email account after the purchase of his company by Workrise. Dkt. 152 at Page 57 [HCS_15945]. Leslie Elliot, Managing Director of Workrise, negotiated the Imaware contract to test the Haitian employees. Dkt. 152 at Page 57 [HCS_15945]. As support that Workrise was involved in the layoffs, testimony that HCS escalated the discrimination complaint to Workrise for support is evidence that Workrise would have been involved in the layoff as well. Nickelson Declaration Paragraph 16. (Dkt. 152). Vice President Burns confirmed that Stephanie Noel's (another Haitian employee) discrimination complaint was sent first to President Nickelson at HCS and then to Workrise HR, and at that point, Workrise dealt with the complaint. Dkt. 152 at Page 488 [Burns 55:6-13]; Sealed Exhibit 3 [HCS_1038-40]; Dkt. 152 at Page 515 [Nickelson 26:17-24]. A fact issue exists as to the interrelation of operations and common management.

Facts supporting the last factor, common ownership or financial control, is the ownership of HCS by Workrise and financial control by virtue of a parent over a subsidiary. While not conclusive, this fact along with facts supporting the other factors, raises a fact issue as to whether the two entities are liable as an integrated enterprise for the purposes of a discrimination claim.

*Response to Motion for Summary Judgment*                                          *Page 12*

**THE DISCRIMINATION ISSUE**

Plaintiffs have triable claims against Workrise and HCS for violations of the Civil Rights Act of 1866 because of race and national origin discrimination. Following the statutory language of Title VII, the issue is whether a reasonable jury could conclude that plaintiffs were treated differently because of a protected trait or conduct. Title VII, § 703-704; 42 U.S.C.A. § 2000e-2. The term "because of" in the statute is interpreted as traditional but-for causation. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020). Events have multiple but-for causes. *Id.* A defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision; so long as the plaintiff's protected activity was one but-for cause of that decision, that is enough to trigger the law. *See id.* (Applying but-for to sex discrimination). It is not sole cause. *Id.* at 1744. It does not even have to be the primary cause. *Id.* Further, proof does not have to be based upon a comparison of one group with another, e.g. men versus women in a sex discrimination suit. *Id.*

## <u>Direct and Circumstantial Evidence Generally</u>

A plaintiff may prove a case by direct or circumstantial evidence. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *W. v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 n.3 (5th Cir.2003) (quoting *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied,* 539 U.S. 926 (2003)). Circumstantial evidence relies upon inference. *Id.* The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citing pattern jury instructions). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.*

(quoting *Rogers v. Mo. Pac. R. Co.,* 352 U.S. 500, 508, n. 17 (1957)). The Plaintiffs rely on circumstantial evidence.

**Direct Evidence**

Direct evidence is evidence, which if believed, proves the fact in question without inference or presumption. *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008). The evidence must be directly connected to an adverse action and not just inferred from anger at the opposition. *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 489 (5th Cir. 2013).

Plaintiffs have direct evidence of discrimination. Defendants admit to segregating Plaintiffs by ethnicity. The argument that races prefer to be segregated is not a valid argument against discrimination. Section 703(a) of the Civil Rights Act of 1964 has made it unlawful for employers to limit, segregate, or classify employees in ways that would deprive them of employment opportunities based on their race . 42 U.S.C. § 2000e-2(a)(2).  Defendants kept the Haitians together as a crew and referred to them generally as a separate group. Exhibit 7. Defendants segregated them from other races. Exhibit 7. The segregation adversely affected the Haitians' employment, pitting Black versus White and Black versus Hispanic. *See* Noel complaint. Sealed Exhibit 13. This caused Defendants' customers to view them as a separate group and paint them with a broad brush. Rather than treating each employee individually as to whether they were following protocol, assuming that all of the Haitians must be violating protocols when a few were allegedly observed violating the protocols. This is admitted discrimination, direct evidence of discrimination.

On February 1, 2020, well before the national outbreak of COVID, Mr. Schiel, an HCS manager, sent the Vice President Burns the following email:

Mr. Burns,

We actually almost got to a stopping point today. They didn't have any real estate until the very last minute. But this was with a very low team moral. I drive thru the field and see the laziness and the stink eyes looking at me. Jamesly is sitting and bullshitting with them. I've told him more than once to get them moving. I will release 15 of the bad Haitians Monday evening, and the remaining 14 on Tuesday. Yes there was only 29 causing the riff yesterday. But when your standing in a 3ft circle surrounded by people screaming at you in a different language, well, it looks like more. I was going to release some today, but I don't need anymore trouble until I have some more management behind me, and some more workers on board. I WILL WIN THIS WAR this week! Monday Mike should be going through the orientation as well as the new foreman.

Now for the news that really hurts me. I think you and I both know that we should have told them yesterday " You want to work? Get in the vans! You don't want to ? Go home!" But since we did not, they currently think they own the field. In fact I've heard from some of the good ones that, that is what they're are telling each other. They only put up 4900 mods. They could have done that with a smaller crew. The part that really bothers me is that we chose the cheap labor over the devoted employees who will and have done anything you wanted. You told me in a text " Cant have someone not being a team player!" What role did we play in letting them win? Were we a team then? The bad seeds would have been gone and I'd have 7 foreman. As of today's end I will have 2. The Haitian Joseph and Cherokee. Denise feels the same as I do, we gave them ( the cheap labor) what they wanted and until Tuesday that's what they'll think. Today is her last day ☹ So now I've lost a field admin as well. I've got her training a new one today ( loyal to the end). This is lack of respect from us to the people loyal to us. Yes Phillip was a friend , who has proved himself, but this isn't about that. We let an asset go for ….cheap labor. You know as well as I he'll find another place. But haven't you been looking for good help you can trust? He goes home while the person whom many of us, Bridgette included, told you not to bring here gets a promotion to " Baby sitter, doesn't have to produce anything" and another new truck.

I feel a little better voicing this to you. I wanted to do it through email, because I know you have a temper ..as do I.. and you might have hung up on me before I could finish. LOL. But it is with a very heavy heart that I will be leaving HCS next Friday. I'm sorry, I don't feel the team anymore. I know , sometimes its just business. But someone once said " A happy employee is a productive employee". Right now you have quite a few unhappy employees on the field. I wish you well in your new Rig up venture and you know as I, I'll see you out there in the Solarcoaster world somewhere. Thanks for listening. Bob

P.S. My phone will be off tonight. I need some quiet time. I will be on site tomorrow and all next week.

Sealed Exhibit 5 [HCS_00938-9].

The combination of statements such as "stink eye," "I will release 15 of the bad Haitians on Monday evening, and the remaining on Tuesday," "I WILL WIN THIS WAR," and "the cheap labor" is direct evidence of discrimination. Sealed Exhibit 5 [HCS_00938-9].The response by Mr. Burns was not an admonition against discrimination and discriminatory statements. Instead, he apologizes for not firing the Haitians sooner, "[He] as just trying to hold on to them until [he] could get replacements." Sealed Exhibit 5 [HCS_00938-9]. The direction in May to terminate the employment of all of the Haitians in May 2020 is direct evidence of discrimination.

If the statements are not considered direct evidence, they may nevertheless be considered as support for indirect or circumstantial evidence in addition to the *McDonnell Douglas* framework. *See Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 225 (5th Cir.2000) (holding that workplace remarks sufficed as circumstantial evidence from which inference of discriminatory intent could be drawn even though comments were "stray remarks" under the *CSC Logic* test); *Gillaspy v. Dall. Indep. Sch. Dist.,* 278 Fed. Appx. 307, 313 (5th Cir.2008); *Jenkins v. Methodist Hosps. of Dall., Inc.,* 478 F.3d 255 (5th Cir.2007), a plaintiff wishing to use workplace remarks as circumstantial evidence of employment discrimination need only show that the remarks demonstrate discriminatory animus on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker. *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 899 (5th Cir. 2002); *Russell,* 235 F.3d at 225; *see also Phillips v. TXU Corp.,* 194 Fed. Appx. 221, 228 (5th Cir.2006) (holding that "[a]

*Response to Motion for Summary Judgment*                                    *Page 16*

remark is considered probative of discrimination if it demonstrates discriminatory animus and was made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.").

### McDonnell Douglas

The standard McDonnell Douglas framework for circumstantial evidence of discrimination is to initially show a prima facie case that (1) she belongs to a protected group, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) a similarly situated employee outside of her protected group was treated more favorably. *See Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021).  Retaliation prima facie may be proven by showing: (1) he engaged in a protected activity; (2) an adverse employment action followed; and (3) the existence of a causal connection. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017). The causal connection in the prima facie case is met based on temporal proximity between the complaint and the adverse employment action. *Schirle v. Sokudo USA, L.L.C.*, 484 Fed. Appx. 893, 899 (5th Cir. 2012); *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir.2001) ("Close timing between an employee's protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation. We note that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." (internal quotation marks and citation omitted)).

The prima facie case raises an inference of discrimination or retaliation. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."). The prima facie inference, together

with evidence of pretext, is proof of discrimination because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Reeves*, 530 U.S. at 141 (2000) (*quoting U.S. Postal Serv Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983)).

An employer can rebut the inference that an adverse action is based on impermissible factors by proffering a legitimate, nondiscriminatory reason. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). When an employer proffers an explanation for the action, a plaintiff may nevertheless succeed either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id.* at 256 (*citing McDonnell Douglas v. Green*, 411 U.S. 792, 804-05 (1973)). The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation. *Id.* at 147. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *Id.*

The Supreme Court "reasoned that it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves* 530 U.S. at 147. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Id.

### Prima Facie Case of Race Discrimination

Defendants do not dispute the existence of a prima facia case.

### 1. Protected Class

Plaintiffs are Black and Haitian, and Defendants do not dispute that Plaintiffs are in a protected class. Exhibit 7. Dkt. 15 at Page 18 (p. 2).

### 2. Qualified

Plaintiffs were qualified for their positions at Workrise and HCS, and Defendants do not dispute that Plaintiffs were qualified. Sealed Exhibit 1 [Elder 30:2-5]; Dkt. 15 at Page 18 (p. 2).

### 3. Adverse Employment Action

Each plaintiff was terminated, and Defendants do not dispute that the Plaintiffs suffered an adverse action. Sealed Exhibit 1 [Elder 30:6-23]; Dkt. 15 at Page 18 (p. 2).

### 4. Similarly Situated Employees Outside of the Protected Class Were Treated More Favorably

Workrise and HCS terminated "the Haitian crew" on May 12, 2020, via text message, which consisted of firing about fifty Haitian employees on a single day. Sealed Exhibit 2 [Nickelson 24:24-25:5; 42:24-43:5; 114:20-115:18]; Sealed Exhibit 14; Sealed Exhibit; Sealed Exhibit 1 [Elder 30:6-23].

On May 13 and 14, 2020, Workrise and HCS hired a replacement crew for the Plaintiffs and the other 50 terminated former Black and Haitian employees. Sealed Exhibit 2 [Nickelson 43:6-9]; Sealed Exhibit 16 [Elder Ex 10]. The replacement crew were non-Black and Non-Haitian. Sealed Exhibit 16 [Elder Ex 10]; Sealed Exhibit 1 [Elder 31:14-19].

Defendants do not dispute that Plaintiffs' allegations are sufficient to plead a prima facie case. Dkt. 15 at Page 18 (p. 2).

## Pretext

HCS and Workrise terminated the Plaintiffs because they are Black and Haitian. HCS claims that it terminated Plaintiffs because 1) Haitian employees were violating COVID protocol more than other races; 2) the Haitians had the most positive test results 3) Haitian employees had workmanship issues; and 4) and Arraycon and Tom Green County instructed HCS to terminate the Haitian employees. These reasons are either illegitimate or not credible or both. They are pretextual excuses to cover up discrimination.

**Excuse (1) Haitian employees were violating COVID protocol more than other races.**

The articulated reason that Haitian workers violated COVID protocols more than other races is not true. The Hispanic crew violated protocols more than the Haitian crew. Exhibit 7. HCS supervisors and Arraycon employees were observed watching many more Hispanic crew members violate COVID protocols than the Haitian crew. Exhibit 7. They know the statement is false. Exhibit 7.

The excuses having anything to do with COVID are controverted by Defendants' actions before the COVID national outbreak. Managers Bob Schiel and Philip Sirrat, managers at the Rambler site called the Black Haitian workers, including Plaintiffs, "Haitian negros," "Niggers," and "Black ass fuckers" on a daily basis as soon as the Black or Haitian employees began working at the Rambler site in San Angelo, Texas. Exhibit 7. Managers would yell at the Haitian employees, including the Plaintiffs, and unfairly criticize their work. Exhibit 7. At the end of January 2020, the Black and Haitian workers stood up and protested against the racist and discriminatory treatment of Manager Schiel and others at the Rambler site. Exhibit 7. They gathered and voiced their complaints through an interpreter, Stephanie Noel, on Friday, January

31, 2020. Exhibit 7. On Saturday, February 1, 2020, Manager Schiel wrote Vice President Burns

that he "will release 15 of the bad Haitians Monday evening, and the remaining 14 on Tuesday."

Sealed Exhibit 5 [HCS_00938-9]. Defendants ultimately terminated six of the Haitian employees

who protested on Monday, February 3, 2020, and the remaining Haitian employees on May 12,

2020. Sealed Exhibit 5 [HCS_00938-9]. Manager Schiel promised, "I WILL WIN THIS WAR

this week!" Sealed Exhibit 5 [HCS_00938-9]. Manager Sheil, referring to the Haitian employees,

complains to Vice President Burns, "The part that really bothers me is that we chose the cheap

labor." Sealed Exhibit 5 [HCS_00938-9]. Manager Sheil states to Vice President Burns that he

needed to write these issues in an email because he knows Vice President Burns has "a

temper…as do I…and you might have hung up on me before I could finish. LOL." Sealed Exhibit

5 [HCS_00938-9]. Vice President Burns confirms that he has a temper. Sealed Exhibit 6 [Burns

22:23-24].

Defendants argue that Managers Schiel and Sirrat were not "individuals with authority"

and "not part of the decision to layoff the Plaintiffs." Dkt. 153 at Page 17. However, Managers

Schiel and Sirrat directed Plaintiffs work daily. Exhibit 7. Manager Schiel writes that he has the

authority to terminate employees and Defendants do not deny that authority in writing. Sealed

Exhibit 5 [HCS_00938-9]. Only now in a motion for summary judgment, do Defendants finally

express that these statements are "inexcusable if true." Dkt. 153 at Page 17. Further, no witness

or representative from HCS or Workrise denies that Managers Schiel or Sirrat had the authority

to terminate or direct the Plaintiffs' work.

Manager Schiel left Workrise and HCS in February 2020. Sealed Exhibit 5 [HCS_00938-

9]. Defendants moved Manager Sirrat to another facility for a couple of weeks before bringing him

back to the Rambler site. Exhibit 7; Sealed Exhibit 6 [Burns 24:2-17]. While the treatment of Black and Haitian workers got better for the few weeks both Manager Schiel and Manager Sirrat were gone, it resumed with Manager Sirrat returned and only got worse until Defendants terminated the remaining 50.

**Excuse (2) The Haitians had the most positive test results.**

The allegation that the Haitian crew had more persons test positive than others is not true. Twenty-one persons tested positive. Sealed Exhibit 3 [HCS_1038-40]. Only nine of these persons were Haitians. Sealed Exhibit 4 [HCS_4136]. Also, using positive COVID test results as an excuse is not legitimate because that reason violates the American with Disabilities Act which prohibits an employer from 'discriminat[ing] against a qualified individual on the basis of disability,' by, among other things, terminating an individual's employment." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016). Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide indefinite leave for a disabled employee. *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017). Placing an employee on temporary leave of only a couple of weeks while recovering from COVID is a reasonable accommodation. *See Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 Fed. Appx. 772, 775 (5th Cir. 2020); *see Williams v. Delta Bus Lines, Inc.*, No. 4:22-CV-87-DMB-JMV, 2024 WL 560631, at *8 (N.D. Miss. Feb. 12, 2024). The remedy is not termination, it is recuperation. Additionally, public policy at the time was generally against terminating an employee simply because they tested positive for COVID. *See* Families First Coronavirus Response Act ("FFCRA") Pub. L. No. 116-127, 134 Stat. 178 (2020).

Additionally, HCS likely cause the increase in positive testing of the Haitians. Eight Haitians tested positive. Sealed Exhibit 4 [HCS_4136]. HCS and Arraycon forced the Haitians to ride in work vans together. Exhibit 7. When Mr. Frederic came down with the virus, he had just been riding in the work van with five other persons as directed by HCS and Arraycon. Exhibit 7. These persons are likely to have later tested positive. Exhibit 7. HCS and Arraycon are the likely cause of the spread of the virus by requiring the Haitian employees to ride in vans together, and they know that they are likely the cause. Exhibit 7.

Using COVID and protocols as an excuse is also belied by Defendants' discriminatory actions before the outbreak. Defendants had been discriminating against the Haitians from the outset. Exhibit 7.

In a site-wide COVID test provided by HCS, Clifford Michel and Guerda Louis tested negative for COVID-19. Sealed Exhibit 17 [HCS_07995-7]. Signal Energy, the general contractor of the Rambler project, from whom HCS testifies had input and gave direction on the termination of the Haitian crew, released Mr. Michel and Ms. Louis from quarantine, and allowed them to "return to work as long as they do not show any symptoms" on May 11, 2020. Sealed Exhibit 2 [Nickelson 47:4-13]; Sealed Exhibit 17 [HCS_07995-7]. Mr. Michel and Ms. Louis did not show any symptoms in May 2020. Exhibit 7. Defendants terminated Plaintiffs the next day on May 12, 2020, alleging COVID protocol violations along with 47 other Haitian workers. Sealed Exhibit 14 [HCS_8200, 8208-13]; Sealed Exhibit 2 [Nickelson 47:17-20].

The final results of the COVID test showed that out of the hundreds of employees tested, 21 workers tested positive, 33 were no-shows, and 555 were negative. ECF 152 page 127 [Vretis

44:2-5]. That means only 3.6% of workers tested positive for COVID, a relatively small portion of the hundreds tested.

While all eight of the employees who tested positive from the Arraycon subcontractor division originally stayed at the Inn of the Conchos hotel, five decided to drive home to recover, including Plaintiff Ralph Frederic. Exhibit 18 [City of San Angelo_862-4]. Only three stayed to quarantine at the Inn of the Conchos. Exhibit 18 [City of San Angelo_862-4]. Inn of the Conchos front desk worker Holly Walraven testified that 35 of the 125 rooms were occupied by Haitian HCS employees. All other HCS and Workrise employees stayed at other hotels or motels in the local area.

Mr. Burns said he "worked the Haitians since 2018…[and] continue[d] to work the Haitians" up until recently when he formed his own company. Dkt. 152 Page 481-82 [Burns 45:23-46:4]. Mr. Burns does not see how paying Haitian workers lower than Hispanic workers could be a sign of discrimination. Dkt. 152 Page 485-86 [Burns 51:23-52:6].

**Excuse (3) Haitian employees had workmanship issues.**

Haitian employees were the hardest-working and most experienced crews that the Defendants had "to date." Sealed Exhibit 2 [Nickelson 22:2-13, 110:17-21]. Defendants rely on inadmissible evidence to assert workmanship issues. Any contrary statements are hearsay.

HCS says that safety requirements have improved every day at the Rambler site. Nickelson Decl. Exhibit 3 [HCS_16002]. On April 6, 2020, Defendants were not sure if safety protocols had been implemented at the Oberon site (the other Texas site). Dkt. 152 at Page 17 [HCS_16005].

It was not unusual for Haitian employees to be falsely accused; for example, on March 26, 2020, an HCS employee at the Rambler site assigned to Arraycon (a Haitian employee) was falsely accused of horse playing when it turned out to be an employee assigned to the Walker subcontractor at the Rambler site. Dkt. 152 at Page 33 [HCS_16021]. Nine employees at Rambler working for Walker violated COVID-19 safety protocols on March 25, 2020. Dkt 152 at Page 39 [HCS_16027].

Defendants do not present admissible evidence of any incorrect installation at the Rambler site. The emails upon which Defendants rely are inadmissible hearsay.

**Excuse (4) Arraycon and Tom Green County instructed HCS to terminate the Haitian employees.**

Defendants do not provide any admissible evidence that Arraycom or Tom Green County instructed the Defendants to either shut down the site or terminate the Haitians. The only documentary evidence shows that Arraycom requested testing and the County mandated quarantining of an individual who tested positive for two weeks.

Even if Arraycon did ask to get rid of the Haitians as Mr. Burns testified (Burns 35:4-8; 38:13-15; 42:1-11), it's a violation of the Civil Rights Act of 1866 to discriminate at the request of a customer. *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971) ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the cus-tomers to determine whether the sex discrimination was valid.")

Defendants chose to shut down the Rambler project site for two weeks in May 2020 due to COVID-19. Exhibit 8 does not state that Signal is directing that the Rambler site be shut down, only that there be testing. Dkt. 152 at Page 60 [HCS_16962]. It was the Defendants' choice to

shut down the site to test rather than to implement individual testing while other employees continued to work.

Defendants conducted one site-wide covid test. Exhibit 7. Twenty-one persons tested positive. Sealed Exhibit 19. Eight of the persons testing positive were Haitians who immediately traveled home (via personal vehicle) or self-quarantined. Sealed Exhibit 20 [HCS 4136-37]. Defendants terminated five workers with Hispanic surnames for violating COVID protocols. Dkt. 152 at Page 73 (p. 14).

Nothing prevented the workers from continuing to work while being tested individually for fifteen to thirty minutes at some point during the day. The decision to shut the site down appears to have been made by Leslie Elliot, managing director of Workrise. Dkt. 152 at Page 60 [HCS_16962]. Mr. Burns did not receive any complaints from leadership at Rambler that Haitian employees were not following COVID protocols on the site. Dkt. 152 at Page 496 [Burns 69:3-6]

The Medical Director, Dr. Vretis, does not state that he directed the Rambler site to be shut down; he simply states that the site "got shut down." ECF 152 page 104 [Vretis 16:7-12]. Viewing the evidence favored to Plaintiffs, the Medical Director is acknowledging the fact that the facility was indeed shut down, not that he shut it down. In fact, even Defendants admit that they made the decision to shut the Rambler site down. The evidence favors that the county did not want the site shut down: the commissioner wanted to get the site back to business as soon as possible. ECF 152 page 106 [Vretis 19:1-6].

Dr. Vretis observed people of all races violating COVID protocols at the Rambler site. Dkt. 152 page 131 [Vretis 58:17-19]. The Medical Director could not tell that all Haitians were violating COVID protocol and had no idea which Black persons were Rambler employees and which were

not. Dkt. 152 page 132-3 [Vretis 59:19-60:6]. Dr. Vretris only checked on Black persons in the early days. Dkt. 152 page 138 [Vretis 75:19-22]. part of the layoff.  On April 16, 2020, the Tom Green County Health Official rescinded the order regulating the operation of golf courses, and on April 20, 2020, he rescinded the requirement of wearing masks. Dkt. 152 at Page 67 [HCS_04635].

Holly Walraven states that she saw Haitians not wearing masks at the motel, although she doesn't say when or provide a time frame. Dkt. 152 at Page 437 [Walraven 20:3-9]. The Medical Director relaxed the protocols to allow people not to wear masks unless they tested positive. Dkt. 152 at Page 68 [HCS_04635].

When initially asked, Ms. Walraven cannot tell who was not social distancing, whether it was Haitian persons or other guests. Dkt. 152 at Page 454 [Walraven 35:2-8]. She only saw one Haitian person not wearing a mask but did not give a time frame. Dkt. 152 at Page 449 [Walraven 36:18-25]. In the end, upon further prompting by Defendants' attorney, Walraven contradicted herself and stated that Defendant employees violated protocol on a daily basis by not wearing a mask. Dkt. 152 at Page 454 [Walraven 53:7-18]. A reasonable jury could accept her initial testimony and reject the contradiction. The Hispanic and White employees violated the same protocols or were worse than the Haitian employees at the same site and yet they were not terminated. Exhibit 7.

HCS did not investigate discrimination in the workplace or potential racism onsite in response to the race war email. Dkt. 152 at Page 582 [Nickelson 136:12-15]. Evidence relied upon that Arraycon and Signal were unhappy due to Haitians breaching COVID protocols is based on inadmissible hearsay. Even if there the evidence is admissible, Signal and Arraycon stated that the

workers at the Rambler site were doing a great job except for one person. Burns Decl. Exhibit 1 (Dkt. #152). [HCS_16325].

**The Token Exception Defense**

Defendants' excuse that "HCS tried to bring back the Haitian installer crew on other projects immediately thereafter" is insufficient. (Dkt. #153, Pg. 19). Not all Plaintiffs were offered jobs. Exhibit 21 [Frederic 58:24-59:1]. And the damage was already done. At best, Defendants' attempt to rectify the adverse employment action of terminating Plaintiffs is evidence of mitigation of lost wage damages.

Defendants' argument that they could not have discriminated against the Haitians because they rehired many of them and terminated some Hispanics is not a valid argument under the law. A court errs in placing great weight on evidence that another person of the same protected trait did not experience similar discrimination. *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 (5th Cir. 2017), as revised (Mar. 13, 2017). There "is no token exception to anti-discrimination law." *Id.* (quoting *Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587–88 (7th Cir. 2011)). Having a racially-balanced workforce, or even a workforce disproportionately high in minorities, is no defense to plaintiff's claim of race discrimination in any given instance. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579 (1978). Anti-discrimination laws do not "give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Conn. v. Teal,* 457 U.S. 440, 455 (1982).

This argument is invalid for another reason, as well. None of the Haitians were allowed to stay at the Rambler site. A force transfer can be an adverse action for which employees can prevail

in a discrimination suit. *Muldrow v. City of St. Louis, Mo.,* 144 S. Ct. 967, 972 (2024). The excuse that it transferred Haitians rather than permanently terminate them is not a defense.

**The Same Actor Inference**

Defendants request the Court to make inferences in their favor, such as the same-actor inference. The same actor inference is just that, an inference. Facts relevant to this argument may be presented to the jury for consideration, and it falls within the province of the jury to decide whether the "same actor" inference should apply in this case, as it is a question of fact rather than one of law. *Golatt v. Perot Museum of Nature & Sci.*, 659 F. Supp. 3d 745, 759 (N.D. Tex. 2023) ("same actor inference" argument fails at the summary judgment stage). As the Fifth Circuit noted, "the "same actor" inference does "not rule out the possibility that an individual could prove a case of discrimination." *Russell* 235 F.3d at 229 (5th Cir. 2000) (quoting *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996)).  Further, "[t]he same actor inference likely does not apply" to an employer's decision to retain an employee, rather than a decision to hire him. *Fitzpatrick v. Pontotoc Cnty., Miss.,* 612 F. App'x 770, 776 n.5 (5th Cir. 2015).

The animus statements, including the use of the N-Word, Black-*sses, bad Haitians, and being at WAR with the Haitians, all negate the inference at the summary judgment stage.

**National Origin Argument**

Plaintiffs are not arguing discrimination based solely or purely on where they were born. They are Black and they are Haitian which identifies as a place but also as a heritage. Defendants say they are treating them differently because of culture and language. The Civil Rights Act of 1866 protects an ethnicity which can imply a place, such as an Arab. *See Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613 (1987) (holding that a claim of racial discrimination pursuant to 42

U.S.C. § 1981 could be based on a showing that discrimination resulted from Arab ethnicity); 29 C.F.R. § 1601.1 (defining national origin discrimination as including "the denial of equal employment opportunity ... because an individual has the physical, cultural or linguistic characteristics of a national origin group."). In *Al-Khazraji*, the individual was described as an Arab, he was from Iraq which is included in the Arabian Peninsula. *See Al-Khazraji* 481 U.S. at 605. Defendants referred to all of the Black crew as Haitians, even though some were from Jamaica or other parts of the Caribbean. This case is about race and ethnicity, not purely national origin.

## OTHER ARGUMENTS OF PRETEXT

### Failure to Follow Policies

The failure of an employer to follow its policies in the matter is evidence of pretext. *See Lindsey v. Bio-Med. Applications of La., L.L.C.*, 9 F.4th 317, 326 (5th Cir. 2021) (employer's failure to follow its own progressive discipline policy); *Russell,* 235 F.3d at 224 (reversing JMOL in part because of pretext evidence that employer had not followed its progressive discipline policies) (ADEA); *Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir. 1998) (ADEA). Defendants did not follow their own policy of investigating complaints of discrimination, making suspicious choices and refusing to complete investigations.

### Proof of Pretext May Be Shown When Evidence is Viewed in Its Totality.

Plaintiffs have presented multiple forms of evidence of pretext, which viewed individually suffice for a factfinder to find pretext. However, the evidence is stronger when viewed as a whole. Evidence of discrimination must be considered in light of the totality of the circumstances. *See Bray v. Marriott Hotels*, 110 F.3d 986 (3rd Cir. 1997) (*citing Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on

its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")). "A plaintiff is not required to 'cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.'" *Steward v. Sears Roebuck & Co.*, 231 Fed. Appx. 201 (3rd Cir. 2007) (*citing Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3rd Cir. 1994)). Common sense comes into play, as well. "Of course, when an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder *may* infer that the employer's asserted reason for its action is a pretext for unlawful discrimination. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1356 (2015) (Alito, J., concurring).

Defendants' excuse of violation of COVID protocol or alleged workmanship issues is incredible when viewed in the context of the history of discrimination at the Rambler project, Plaintiffs' hard work, negative COVID tests, and Defendants' reliance on inadmissible evidence. Viewing the circumstances in context, the termination of Plaintiffs was discriminatory. Viewing the evidence as a whole, in a light most favorable to Plaintiffs, they have met their burden of showing substantial evidence of pretext.

WHEREFORE, Plaintiffs request the Court to deny the motion.

Respectfully submitted,


/s/ Brian P. Sanford
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizabeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

THE SANFORD FIRM
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**


**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2024, I electronically served the foregoing document on all counsel of record via the Court's electronic filing system.


/s/ Brian P. Sanford